**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF INDIANA**
**INDIANAPOLIS DIVISION**

EDDRELL SCOTT,

Plaintiff,

v.

DENNIS REAGLE,
CHRISTINA REAGLE Commissioner,

Defendants.

Case No. 1:23-cv-01631-TWP-CSW

**ORDER DENYING MOTION FOR PRELIMINARY INJUNCTION AND RESOLVING RELATED MOTIONS**

This matter is before the Court on Plaintiff Eddrell Scott's ("Mr. Scott") Motion for Preliminary Injunction/Temporary Restraining Order (Dkt. 25). Also before the Court are two Motions of Complaint (Dkts. 74, 77), five Motions for Court Assistance (Dkts. 75, 79, 92, 96, 97), Motion to Submit Supplementary Evidence (Dkt. 86), Motion for Court Assistance and Notice of Change of Address (Dkt. 93), and Motion-Affidavit and Complaint (Dkt. 94). Mr. Scott filed this civil rights complaint alleging that Dennis Reagle ("Warden Reagle"), the Warden of Pendleton Correctional Facility ("Pendleton"), and Christina Reagle ("Commissioner Reagle"), the Commissioner of the Indiana Department of Correction ("IDOC"), failed to protect him from violent attacks by other inmates by refusing to place him in protective custody. (Dkt. 2). The Court screened the Complaint and permitted an Eighth Amendment failure-to-protect claim to proceed against the Defendants. (Dkt. 19). On November 29, 2023, Mr. Scott filed a motion for preliminary injunction requesting that he be placed in protective custody. (Dkt. 25). In this Order, the Court **denies** the request for injunctive relief and resolves the other related motions.

## I. FACTUAL BACKGROUND

**A. Mr. Scott's Allegations in his Complaint and Motion for Preliminary Injunction**

In his Complaint, filed on September 11, 2023, Mr. Scott alleges that while being housed at Pendleton, he requested protective custody on three occasions. On each occasion Warden Reagle and Commissioner Reagle refused to approve his placement request, despite Mr. Scott being attacked by inmates multiple times. (Dkt. 2.)

Mr. Scott filed the motion for preliminary injunction on November 29, 2023. (Dkt. 25.) In the motion, he requested that the Court order that he be placed in protective custody so that he did not "have to be attacked for the 6th time." *Id.* at 1. He believed he would suffer irreparable harm because if he was not placed in protective custody, he could lose good time credit due to fighting, become injured, or hurt someone else. *Id*.

**B. IDOC's Protective Custody Policy**

The IDOC has a policy that governs protective custody. (Dkt. 46-1 (*see* IDOC Policy No. 02-01-107, "The Use and Operation of Protective Custody").) An inmate may be admitted into protective custody when it is "based upon the belief that the offender needs to be protected from other offenders" and "only when there is documentation that protective custody is warranted, and that no other reasonable placement alternative is available." *Id.* at 1, 2; Dkt. 46-6 at ¶ 8. An inmate may request assignment to a protective custody unit by submitting State Form 24308, Request for Protection ("PC Request Form"). (Dkt. 46-1 at 2.) Designated staff then reviews that form to "verify the potential need for protective custody." *Id.* at 2.

**C. Mr. Scott's Requests for Protective Custody**

Mr. Scott submitted three PC Request Forms to request protective custody in 2023: two in February and one in July. (Dkts. 46-2, 46-3, 46-4.) In his first request dated February 16, 2023, he wrote that he had "vali[d] information to report to prove my statements" and "times and dates" showing that he was "in great danger and so is [his] family." (Dkt. 46-2.) Because Mr. Scott provided no proof or documentation, Pendleton staff denied the request. *Id*. Mr. Scott signed the form to acknowledge his understanding of the resolution of the request. *Id.*; Dkt. 46-6 at ¶ 11.

A few days later, on February 21, 2023, Mr. Scott submitted a PC Request Form again alleging that a gang was attacking him and being paid to stab him and, as a result, he was "forced to go to PC or fight for my life" and that he did not "want to have to take somebody life to save me." (Dkt. 46-3.) Staff again responded that the request was denied for lack of "verified, documented information on PC request," and Mr. Scott again signed the form. *Id*.

Mr. Scott filed his final request for protective custody on July 24, 2023, alleging that he "went under a gang attack" and that there was a report where an IDOC staff member did "witness several gang members attacking [Mr. Scott.]" (Dkt. 46-4.) Staff again denied the request stating they "cannot verify claims of threats he is alleging" and they believed Mr. Scott was "creating drug debts through constant drug use."[1] *Id*. IDOC staff decided that Mr. Scott "would be moved from the situation however." *Id*. As stated, Mr. Scott was moved that same day, which is reflected in his IDOC Location History. (Dkt. 46-5; Dkt. 46-6 at ¶ 14.)

---

[1] Mr. Scott disputes that there is no evidence that inmates were attacking him. In support, he submitted email correspondence from February 21, 2023, which reflects that when Mr. Scott requested protective custody, he informed IDOC employee John Miller that an inmate named Maul and inmates associated with the Vicelords were threatening him. (Dkt. 86-1 at 17.) Someone responded to the email stating Mr. Scott had been discovered high on several occasions, and the staff member believed that Mr. Scott was trying to pursue protective custody to get out of paying a drug debt. *Id.* Thus, this email correspondence is consistent with the reasoning Defendants provided for denying him protective custody.

No reports have been produced that document an IDOC staff member witnessing Mr. Scott involved in a gang attack between January and July 2023. State Form 7212, Incident Report Form, documents all relevant incidents with details about the involved parties, the location, and the subsequent action taken by IDOC staff. (Dkt. 46-6 at ¶ 15.) During the relevant timeframe, there were eight reports involving Mr. Scott, and none involved violence or attacks with other inmates. The eight reports involved actions and conduct concerning Mr. Scott and Pendleton staff members. *Id.* at ¶¶ 16-17. (*See* Dkt. 46-7 Incident Reports describing an incident where Mr. Scott was sprayed with OC spray due to not obeying an order; an incident where Mr. Scott was found with suspected drugs; several incidents where Mr. Scott engaged in self-harm; and two incidents where he acted belligerently towards correctional staff.)

Because there was no documentation of any incidents involving violence or attacks against Mr. Scott by other inmates, and Mr. Scott's claims in his PC Request Forms were otherwise not corroborated, IDOC staff determined that Mr. Scott did not need to be placed in protective custody status but that relocating him to a different housing unit in July 2023 was an appropriate response. (Dkt. 46-6 at ¶ 18.)

**D. <u>April 2024 Stabbing Incident</u>**

On April 23, 2024, Caseworker S. Adams was on Mr. Scott's housing range when she saw inmate Lance Marley outside of his cell. (Dkt. 73-1 at 1). She ordered Marley to return to his cell, and she closed the cell door from the panel box. *Id.* However, Marley held the door open and slipped outside his cell. *Id.*

Mr. Scott walked up to Marley, leaned towards him, and said something before walking back down the corridor. *Id.*; *see also* Ex. L, Video at 0:24−40. Marley turned and charged at Mr. Scott and began stabbing him with a homemade weapon. (Dkt. 73-1 at 1; Ex. L at 0:40−58.)

Caseworker Adams called for help via the radio and ordered the inmates to stop fighting. (Dkt. 73-1 at 1.) She sprayed Marley with a burst of OC Spray, and Mr. Scott took control of the weapon. *Id.* The inmates stopped fighting, and Mr. Scott dropped the weapon. *Id*.

Mr. Scott was taken to the medical department where he received pain medication, stitches, and an x-ray. *Id.*; Dkt. 73-3 at 16, 20. Mr. Scott was then taken to an area hospital where he was assessed and discharged. (Dkt. 73-3 at 2.) Upon his return from the hospital, he was placed in yet another different housing unit. (Dkt. 73-4; Dkt. 88-1 at ¶ 6.)

### E. Mr. Scott's Mental Health Symptoms and Transfer to New Castle Correctional Facility

Mr. Scott was prescribed Lithium when he was at the hospital being treated for his stab wound. *Id.* at 3. On April 25, 2024, Mr. Scott submitted a healthcare request form asking to see a mental health therapist because he was having trouble coping after the stabbing incident. (Dkt. 73-3 at 1.) Due to Mr. Scott's chronic mental health issues, it was recommended that his mental health code be changed and that he be transferred to a mental health unit. (Dkt. 90-3 at 1.) Mr. Scott was transferred to a mental health unit at New Castle Correctional Facility ("New Castle") on or around June 25, 2024. *Id.* at 3.

## II. MOTION FOR PRELIMINARY INJUNCTION

### A. Legal Standard

"A preliminary injunction is an extraordinary equitable remedy that is available only when the movant shows clear need." *Turnell v. Centimark Corp.*, 796 F.3d 656, 661 (7th Cir. 2015). To obtain a preliminary injunction a plaintiff first must show that: "(1) without this relief, [he] will suffer irreparable harm; (2) traditional legal remedies would be inadequate; and (3) [he] has some likelihood of prevailing on the merits of [his] claims." *Speech First, Inc. v. Killen*, 968 F.3d 628, 637 (7th Cir. 2020). If the plaintiff meets these threshold requirements, "the court then must weigh

the harm the denial of the preliminary injunction would cause the plaintiff against the harm to the defendant if the court were to grant it." *Id*. "[A] preliminary injunction is an exercise of a very far-reaching power, never to be indulged in except in a case clearly demanding it." *Orr v. Shicker*, 953 F.3d 490. 501 (7th Cir. 2020) (cleaned up).

**B. <u>Discussion</u>**

Mr. Scott's motion must be denied because he can neither show that he has a likelihood of success on the merits nor that he will likely suffer irreparable harm without injunctive relief.

"A movant's showing of likelihood of success on the merits must be strong." *Tully v. Okeson*, 977 F.3d 608, 613 (7th Cir. 2020) (quotation marks omitted). A "better than negligible" likelihood of success is not enough. *Ill. Republican Party v. Pritzker*, 973 F.3d 760, 762−63 (7th Cir. 2020). "A 'strong' showing ... does not mean proof by a preponderance .... But it normally includes a demonstration of how the applicant proposes to prove the key elements of its case." *Id.* Prison officials have a duty to protect inmates from violent assaults by other inmates. *Farmer v. Brennan*, 511 U.S. 825, 833 (1994). They incur liability for the breach of that duty when they were "aware of a substantial risk of serious injury to [an inmate] but nevertheless failed to take appropriate steps to protect him from a known danger." *Guzman v. Sheahan*, 495 F.3d 852, 857 (7th Cir. 2007) (cleaned up); *see also Santiago v. Walls*, 599 F.3d 749, 758–59 (7th Cir. 2010). To succeed on a claim for failure to protect, Mr. Scott must show that (1) the Defendants were aware of a substantial risk of serious injury to him, and (2) they acted with deliberate indifference to that risk. *See Farmer*, 511 U.S. at 834, 837; *Dale v. Poston*, 548 F.3d 563, 569 (7th Cir. 2008). An official will only be liable when he disregards that risk by failing to take reasonable measures to abate it. *Borello v. Allison*, 446 F.3d 742, 747 (7th Cir. 2006).

The evidence shows that Mr. Scott's 2023 requests for protective custody were denied due to a lack of evidence that he was being threatened by gangs. Regardless, Mr. Scott was moved to another housing unit in July 2023 in response to his concerns and the fact that there was some evidence that he did not get along with other inmates. Whether that was due to a drug debt or because the inmates were threatening Mr. Scott is of no relevance. He cannot show that Defendants were deliberately indifferent to a risk of harm because they moved him in response to his requests. *Borello*, 446 F.3d at 747. Thus, he has not made a strong showing of success on the merits.

Nor can Mr. Scott prove he will be subjected to irreparable harm because of his transfer to another facility. Irreparable harm is "harm that 'cannot be repaired' and for which money compensation is inadequate." *Orr*, 953 F.3d at 502 (quoting *Graham v. Med. Mut. of Ohio*, 130 F.3d 293, 296 (7th Cir. 1997)). The plaintiff must show "that he will *likely* suffer irreparable harm absent obtaining preliminary injunctive relief." *Id.* (cleaned up). There is evidence in the record that Mr. Scott did not get along with other inmates in his housing unit at Pendleton, and that on April 23, 2024 this led to the unfortunate incident in which he was stabbed by another inmate. However, Mr. Scott has now been transferred to a different facility. While he has not been placed in protective custody at New Castle, there is no indication that other inmates from the housing unit at Pendleton would similarly be transferred to the mental health unit at New Castle. Mr. Scott acknowledges as much and in his Motion for Court Assistance requests that the Court issue an injunction that would prevent him from being transferred back to Pendleton. (Dkt. 92 at 2.) "If a prisoner is transferred to another prison, his request for injunctive relief against officials of the first prison is moot unless he can demonstrate that he is likely to be retransferred." *Higgason v. Farley*, 83 F.3d 807, 811 (7th Cir. 1996) (cleaned up). Mr. Scott's fear that he will be sent back to

Pendleton is speculative. In short, he cannot show that he will be subject to irreparable harm absent an injunction. For these reasons, Mr. Scott's Motion for preliminary injunction, (Dkt. 25), is **denied**.

## III. OTHER PENDING MOTIONS

After the April stabbing incident, Mr. Scott has filed various motions requesting assistance.

### A. May 22, 2024, Motion of Complaint (Dkt. 74) and May 29, 2024, Motion for Complaint and Assistance (Dkt. 77)

In these motions, Mr. Scott alleges that the Defendants omitted important medical records and relevant video evidence from their supplemental documentation because they are trying to prevent another lawsuit. (Dkts. 74, 77.) There is no evidence that the Defendants failed to comply with the Court's Order; the Court received all relevant documentation it needed to evaluate the stabbing incident and its relevance to Mr. Scott's claim in this case. Further, in response to Mr. Scott's motion, the Defendants supplemented the record further with an additional video and healthcare request forms that it was able to locate. (Dkt. 88.) Finding no bad faith on the part of the Defendants in this situation, these motions, Dkt. 74 and Dkt. 77, are **denied**.

### B. May 22, 2024, Motion for Court Assistance (Dkt. 75)

Here, Mr. Scott expresses disappointment that no criminal charges have been brought against Marley. Referencing this Court's previous Order in which the Court informed Mr. Scott that it does not conduct nor direct criminal investigations, but that Mr. Scott may send any information directly to law enforcement agencies, (Dkt. 72 at 4−5), Mr. Scott requests the Federal Bureau of Investigation's address. The Motion is **granted** to the extent that Mr. Scott is informed that the FBI's Indianapolis field office is located at 8825 Nelson B Klein Parkway, Indianapolis, Indiana 46250.

Also in this Motion, Mr. Scott makes an implausible allegation that IDOC staff at Pendleton have harassed him by playing over the PA speaker "audio of my mother and family being raped" and that they "made threats to feed [him] more feces and poison [his] food with [fentanyl]." *Id.* at 1 (cleaned up). Unit Team Manager Joshua Shaver attested that "Pendleton Correctional staff did not and has not made any threats over the PA speaker or used racist or other discriminatory language as Mr. Scott suggests in his Affidavit."[2] (Dkt. 88-1 at ¶ 14.) Mr. Scott's Motion is **denied** to the extent that the Court concludes that these improbable allegations are not rooted in reality but rather a result of Mr. Scott's fragile mental state. Further, there is no relief the Court could provide him because he is now housed at a different correctional facility.

**C. <u>June 5, 2024, Motion for Court Assistance (Dkt. 79)</u>**

In this Motion, Mr. Scott inquires about the status of his filing fee in two other cases; he alleges that staff have retaliated by refusing him medical care for his stab wound; he inquires about the status of his transfer; and complains that inmates at Pendleton are now prevented from contacting the ombudsman. This Motion is **denied**. None of Mr. Scott's cases have been dismissed for not paying an initial partial filing fee, and any concern about a filing fee should be addressed in the relevant case. There is no evidence that Mr. Scott has failed to receive medical care for his stab wound—the medical records show that he has, and that the injury was relatively minor. (Dkt. 73-3.) Mr. Scott has now been transferred to New Castle, rendering the third inquiry moot. Finally, Mr. Scott does not explain what relevance his ability to contact the ombudsman has to the allegations in this case.

---

[2] The affidavit at Dkt. 78 makes the same claims as those in this Motion.

**D. June 19, 2024, Motion to Submit Supplementary Evidence (Dkt. 86)**

Mr. Scott's motion to submit supplementary evidence, (Dkt. 86), is **granted to the extent** that the Court reviewed and considered Mr. Scott's exhibits at Docket 86-1 when ruling on the motion for preliminary injunction.

**E. July 3, 2024, Motion for Court Assistance (Dkt. 92); July 3, 2024, Motion for Court Assistance and Notice of Change of Address (Dkt. 93); and July 8, 2024, Motion Affidavit and Complaint (Dkt. 94)**

These Motions were filed after Mr. Scott's transfer to New Castle. He states that he has not received copies of various documents because he does not have access to his property. Mr. Scott expresses concern that the Court did not receive the motions. He also asks that he be allowed to participate in e-filing. These Motions, (Dkts. 92, 93, and 94), are **granted in part and denied in part**. They are **granted** to the extent that **the Clerk is directed** to send Mr. Scott a copy of the docket sheet with his copy of this Order. It takes time for property to be transferred from one facility to another. If Mr. Scott has not received copies of his legal documents by the time he receives this Order, he may renew his request for copies by referencing the docket numbers of the motions or orders that he does not have copies of. The Motions are **denied** to the extent that the Court cannot reinstate Mr. Scott's e-filing privileges because he is now housed at a facility that does not participate in e-filing.

**F. July 14, 2024, Motion for Assistance (Dkt. 96)**

In this Motion, Mr. Scott accuses IDOC staff of moving him to the cell house where he was attacked in April 2024 as part of a conspiracy to have him killed. He asks why there was no internal affairs investigation into the attack and states he wants to file criminal charges. He then reiterates that he has not received copies of some filings since his transfer to New Castle. The

Motion, (Dkt. 96), is **denied**. As the Court has explained, it does not control investigations at IDOC facilities. His request for copies is **denied** for the reasons explained above.

**G. July 26, 2024, Motion for Assistance (Dkt. 97)**

In this Motion, Mr. Scott asks that the courts—as well as the ACLU, Mrs. Dwenger, and Chief Judge Tanya W. Pratt—to "please have someone intervene and protect the secured rights of prisoners with disabilities." (Dkt. 97). He then discusses that his and other inmates' rights have been violated and that officials have been deliberately indifferent to the health and safety of prisoners, and he desires to bring a class action. *Id*. While the Court is sympathetic to these concerns, in this case, the Court is only able to address the claim that has survived screening; that being Mr. Scott's Eighth Amendment failure-to-protect claim against Dennis Reagle and Christina Reagle. A separate lawsuit would need to be filed to address the purported class action claims. Accordingly, the motion for assistance is **denied**.

## IV. CONCLUSION

In summary, because Defendants responded reasonably to Mr. Scott's requests for protective custody, and because he has now been transferred to a different facility, the Motion for preliminary injunction, Dkt. [25] is **DENIED**. The Motions at dockets [74], [77], [79], [96] and [97] are **DENIED**. The Motions at dockets [75], [92], [93] and [94] are **GRANTED in part and DENIED in part** as set forth above. The Motion at docket [86] is **GRANTED**.

**SO ORDERED.**

Date: 7/30/2024

Hon. Tanya Walton Pratt, Chief Judge
United States District Court
Southern District of Indiana

DISTRIBUTION:

Eddrell Scott, #132122
NEW CASTLE CORRECTIONAL FACILITY
1000 Van Nuys Road
P.O. Box E
New Castle, Indiana 47362

Brandyn Lee Arnold
INDIANA ATTORNEY GENERAL'S OFFICE
brandyn.arnold@atg.in.gov

Jacob Paul Zurschmiede
INDIANA ATTORNEY GENERAL'S OFFICE
jake.zurschmiede@atg.in.gov

James Michael Sedam
METZGER ROSTA LLP
james.sedam@atg.in.gov

Joshua Khalili
INDIANA ATTORNEY GENERAL'S OFFICE
joshua.khalili@atg.in.gov