UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| EDDRELL SCOTT, | ) |
|                 Plaintiff, | ) ) ) |
|                 v. | ) ) Case No. 1:23-cv-01631-TWP-CSW |
| DENNIS REAGLE, CHRISTINA REAGLE Commissioner, | ) ) ) ) |
|                 Defendants. | ) |

**ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT, GRANTING MOTION FOR FORMS, AND DENYING MOTION FOR ASSISTANCE**

This matter is before the Court on a Motion for Summary Judgment filed by Defendants Dennis Reagle ("Warden Reagle") and Christina Reagle ("Commissioner Reagle") (together, "Defendants") (Dkt. 122). Also pending are a Motion for Court Forms (Dkt. 154) and Motion for Court Assistance (Dkt. 155) filed by *pro se* Plaintiff Eddrell Scott ("Mr. Scott"). Mr. Scott, a formerly incarcerated individual, brings this civil rights action alleging that Indiana Department of Correction ("IDOC") Commissioner Reagle, and Pendleton Correctional Facility ("Pendleton") Warden Reagle were deliberately indifferent to his safety by failing to approve his requests to be placed in protective custody. For the reasons stated below, Defendants' summary judgment motion is **granted**, the motion for forms is **granted**, and the motion for assistance is **denied**.

### I. STANDARD OF REVIEW

A motion for summary judgment asks the Court to find that a trial is unnecessary because there is no genuine dispute as to any material fact and, instead, the movant is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a). When reviewing a motion for summary judgment, the Court views the record and draws all reasonable inferences from it in the light most favorable

to the nonmoving party. *Khungar v. Access Cmty. Health Network*, 985 F.3d 565, 572–73 (7th Cir. 2021). It cannot weigh evidence or make credibility determinations on summary judgment because those tasks are left to the fact-finder. *Miller v. Gonzalez*, 761 F.3d 822, 827 (7th Cir. 2014). A court only has to consider the materials cited by the parties, *see* Fed. R. Civ. P. 56(c)(3); it need not "scour the record" for evidence that might be relevant. *Grant v. Trs. of Ind. Univ.*, 870 F.3d 562, 573−74 (7th Cir. 2017).

A party seeking summary judgment must inform the district court of the basis for its motion and identify the record evidence it contends demonstrates the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

Whether a party asserts that a fact is undisputed or genuinely disputed, the party must support the asserted fact by citing to particular parts of the record, including depositions, documents, or affidavits. Fed. R. Civ. P. 56(c)(1)(A). Failure to properly support a fact in opposition to a movant's factual assertion can result in the movant's fact being considered undisputed, and potentially in the grant of summary judgment. Fed. R. Civ. P. 56(e).

## II. FACTUAL BACKGROUND

Because Defendants have moved for summary judgment under Rule 56(a), the Court views and recites the evidence in the light most favorable to Mr. Scott and draws all reasonable inferences in his favor. *Khungar*, 985 F.3d at 572–73.

**A.   IDOC's Protective Custody Policy and the Parties**

IDOC has a policy in place that governs protective custody (the "Protective Custody Policy") (Dkt. 46-1 (IDOC Policy No. 02-01-107, The Use and Operation of Protective Custody)). An inmate may be admitted into protective custody when it is "based upon the belief that the offender needs to be protected from other offenders" and "only when there is documentation that

protective custody is warranted and that no other reasonable placement alternative is available." *Id.* at 1−2; (Dkt. 46-6 ¶ 8 (D. Reagle Aff.)). An inmate may request assignment to a protective custody unit by submitting "State Form 24308, Request for Protection" (Dkt. 46-1 at 2). Designated staff then reviews that form to "verify the potential need for protective custody." *Id.*

Mr. Scott's incarceration at Pendleton began on January 7, 2020, and he remained at Pendleton until his transfer to New Castle Correctional Facility in June 2024 (Dkt. 2, Dkt. 95, Dkt. 123-1). Mr. Scott was released from IDOC custody in November 2024 (Dkt. 135). Mr. Scott is a former member of the gang "Almighty Vice Lord Nation." (Dkt. 123-1 at 18–21 (Scott Dep.)). However, he was not a member of a gang at any time relevant to this lawsuit and was not designated as a member of a security threat group. *Id.*

Warden Reagle was the warden of Pendleton throughout 2023 and until February 2024, when he became warden of another IDOC facility (Dkt. 123-2 ¶ 2 (D. Reagle Aff.)). As the warden of Pendleton, he was not directly involved in all protective custody requests made by inmates. *Id.* ¶ 4. Rather, protective custody requests were evaluated by a committee who would assess each request to determine if protective custody was warranted pursuant to the Protective Custody Policy. *Id.* Warden Reagle was only made aware of an inmate's request to be placed in protective custody if it involved a particularly complex situation or a transfer to a different facility. *Id.* ¶ 5. Warden Reagle also received copies of a "State Form 7212; Incident Report Form," which documents the description of the relevant incident, the involved parties, the location, and the subsequent action taken by IDOC (Dkt. 46-6 ¶ 15). Warden Reagle received twenty to thirty incident reports per day (Dkt. 123-2 ¶ 3).

Commissioner Reagle was at all relevant times the Commissioner of IDOC[1] (Dkt. 123-6 ¶ 2). In her capacity as Commissioner, she oversaw the entire agency, which includes twenty-one correctional facilities housing approximately 24,000 inmates and 5,600 employees. *Id.* As Commissioner, she was not involved in overseeing requests for protective custody filed by inmates or moving an inmate from one cellhouse to another in the inmates respective facility. *Id.* ¶ 4.

Commissioner Reagle was typically not made aware of grievances that named her. *Id.* ¶ 6. She would occasionally receive a notification from the IDOC Ombudsman about a complaint filed by an inmate, but she was not made aware of all complaints made to the Ombudsman, nor did she know the criteria the Ombudsman would use to determine whether to notify her of a particular complaint. *Id.* ¶ 7. Based on Commissioner Reagle's review of her records, she never received a notification from the IDOC Ombudsman about Mr. Scott's requests for protective custody or any concerns that he was threatened by individuals at Pendleton. *Id.* ¶ 8. To the best of Commissioner Reagle's recollection and review of her records, she was not involved in Mr. Scott's protective custody requests, his location changes within Pendleton, or any attacks on him by other inmates. *Id.* ¶ 9. Mr. Scott has never spoken with Commissioner Reagle[2] (Dkt. 123-1 at 22).

**B.      Mr. Scott's February 2023 Requests for Protective Custody**

In February of 2023, Mr. Scott was housed in H Cellhouse at Pendleton when he filed a Prison Rape Elimination Act ("PREA") complaint against another inmate named "J Dot." (Dkt. 123-1 at 16, 31). The report stated that J Dot threatened to sexually assault Mr. Scott. *Id.* at 31.

---

[1] The Court takes judicial notice that Lloyd Arnold is now the Commissioner of IDOC. *See* Indiana Department of Correction, "Leadership Team," https://www.in.gov/idoc/about/commissioners-office/ (last visited Sept. 26, 2025).

[2] Mr. Scott speculates that Warden Reagle and Commissioner Reagle are married and that this is why Commissioner Reagle was motivated to harm him (Dkt. 123-1 at 22, 24). But the record is devoid of any evidence that they are married, or that any personal relationship resulted in Mr. Scott being denied protective custody. Thus, the Court need not address this line of reasoning further. *White v. City of Chi.*, 829 F.3d 837, 841 (7th Cir. 2016) (non-movant receives the "benefit of reasonable inferences from the evidence, but not speculative inferences in his favor" (citation omitted)).

Mr. Scott did not take that threat seriously, but he decided to file a PREA complaint in order to be moved to a different cell. *Id.* When staff failed to respond to the PREA complaint, Mr. Scott barricaded himself in his cell for several days. *Id.* at 31–33. After barricading himself, an inmate who Mr. Scott did not know spit on Mr. Scott through the bars of his cell and tried to attack him. *Id.* at 30–31.

Mr. Scott submitted his first protective custody request on February 16, 2023 (Dkt. 46-2). In it, he explained that he had "vali[d] information to report to prove [his] statements" and "times and dates" showing that he was "in great danger and so [was his] family." (Dkt. 46-2). Because Mr. Scott provided no proof or documentation, a non-defendant staff member denied the request. *Id.* There is no evidence in the record that Warden Reagle was aware of this first request (*see* Dkt. 123-2 ¶ 7 (attesting Warden Reagle was only contacted about the February 21, 2023 request)).

On February 21, 2023, Mr. Scott submitted another protective custody form alleging that a gang was attacking him and being paid to stab him and, as a result, he was "forced to go to [protective custody] or fight for [his] life" and that he did not "want to have to take somebody['s] life to save [his] life." (Dkt. 46-3 at 1, 6). IDOC Staff again denied the request for lack of "verifiable, documented information on [protective custody] request." *Id.* at 1.

That same day, Sergeant John Miller wrote an email to a group of IDOC staff, including Warden Reagle:

> Ofd Scott is here in dhb office for two conducts, interfering with staff and interfering with locking device. He claims that he had told information on vicelords and Ofd. Maul(bumps). He turned in two [protective custody] forms and every [*sic*] since has barricaded himself in his cell due to threats from offenders including directly from Maul. He has dates and times wrote [*sic*] down, I quickly reviewed cameras on a couple of things to verify. On 2-15-23 at 8:49pm Maul is seen going to Scotts [*sic*] cell 13-6a. Scott says this is when maul made threats to him and that Maul lives on the other side of hch. He said he tied his cell door off and the next morning I did see on video 2-16-23 at 9:23am several ofds try to get his door open. He claims the guy in the hat had a large knife and that cell 16-6a has been paid to

5

stab him. Is this something you guys have time to look into? Id [*sic*] rather not send him back to the cellhouse till this gets looked into. He does have seg time "on the shelf" so if there are beds open and need be we could look into giving him seg time. Not sure where his [protective custody] paperwork stands.

(Dkt. 123-3 at 3).

Another IDOC staff member responded twenty minutes later, stating, "Scott has lied or not been specific on his previous [protective custody] requests, which is why they've been denied. Yesterday he was written up for false PREA. If Scott can fill out a [protective custody] request with honest, documented, specific information, we would be more than willing to review it." *Id.* at 2–3. The staff member went on to speculate that Mr. Scott wanted to be placed in protective custody to avoid paying a drug debt. *Id.* at 3.

Sergeant Miller responded seven minutes later, stating, "I agree 100%. He is a well known addict and Im [*sic*] sure he owes debt. My concern is that there are verifiable threats that he reported to me and I wanted to make it known. If he is good to go back to his cell now, Ill [*sic*] send him back?" *Id.* at 2. About forty minutes later, Warden Reagle responded, "[h]e should go back to his unit and discuss those threats with his case management staff or custody to submit a new [protective custody] request." *Id.* Three minutes later, an officer confirmed that Mr. Scott had been returned to his housing unit and made aware of the procedure. *Id.* at 1. Warden Reagle responded, "[m]ake sure the unit know [*sic*] that he may need to be seen though or may act out to get thrown in [segregated housing]." *Id.*

The next day, Mr. Scott was moved to J Cellhouse after one of his attorneys on another matter called the prison to voice her concerns about his safety (Dkt. 123-1 at 37–38; Dkt. 123-4). J Dot was also moved to J Cellhouse. Mr. Scott informed his counselor about this, and J Dot was moved a few days later (Dkt. 123-1 at 38–39). J Dot did not physically assault Mr. Scott when they were housed in J Cellhouse together. *Id.*

## C. Mr. Scott's July 2023 Request for Protective Custody

From J Cellhouse, Mr. Scott was transferred to G Cellhouse, a segregation unit, where he resided from May 8, 2023, to July 19, 2023, when he was transferred to E Cellhouse (Dkt. 123-1 at 40; Dkt. 123-4). On July 21, 2023, Mr. Scott reported to an officer that inmate Nathan Jenkins ("Jenkins") had a shank and was going to kill him (Dkt. 123-1 at 76). The officer searched Jenkins's cell and secured an 8-inch-long metal object. *Id.*; (Dkt. 123-5 at 2 (email communication about the shank)). The officer sent an email about the incident to over one hundred Pendleton staff members, including Warden Reagle (Dkt. 123-5 at 1–2). Although Mr. Scott was mentioned in the email, Jenkins was the primary focus, as he was in possession of the weapon. *Id.* at 2.

Mr. Scott filed another protective custody request form on July 24, in which he reported that he was attacked by gang members and requested protective custody (Dkt. 46-4). This request was denied, with someone writing, "[c]annot verify claims of threats he is alleging. OFD Scott is believed to be creating drug debts through constant drug use. OFD will be moved from the situation however."[3] *Id.* Mr. Scott was moved to H Cellhouse that day (Dkt. 46-5). Warden Reagle does not have any recollection of being advised of this protective custody request (Dkt. 123-2 ¶ 12).

During the time frame that Mr. Scott requested protective custody, there were no incident reports that reflected any IDOC staff member witnessing Mr. Scott's involvement in a gang attack (Dkt. 46-6 ¶ 15). There were eight reports involving Mr. Scott, but none involved violence or attacks with other inmates. *Id.* ¶¶ 16–17. The eight reports involved actions and conduct between Mr. Scott and staff members (Dkt. 46-7 (Incident Reports) (describing an incident where Mr. Scott was sprayed with pepper spray due to not obeying an order; an incident where Mr. Scott was found

---

[3] Mr. Scott admitted that he used drugs throughout 2023, but he denied that his conflicts with other inmates were related to drug debts (Dkt. 123-1 at 47, 72). This dispute is not material to the outcome of the case because Mr. Scott has presented no evidence that correctional staff did not believe that his conflicts may have been drug related.

with suspected drugs; several incidents where Mr. Scott engaged in self-harm; and two incidents where he acted belligerently towards staff); Dkt. 46-6 ¶ 17).

Mr. Scott was never seriously physically injured in any of the encounters with inmates that resulted in him seeking protective custody in 2023 (Dkt. 123-1 at 71). After one incident in which Mr. Scott hit another inmate, he only testified that his "hand was swollen [from] having to fight." *Id.* at 82:21–22).

**D.     April 2024 Attack on Mr. Scott**

By April 2024, Warden Reagle was no longer the warden of Pendleton (Dkt. 123-2 ¶ 2). On April 23, 2024, inmate Lance Marley slipped out of his cell and stabbed Mr. Scott (Dkt. 73-1 at 1 (Incident Report)). Mr. Scott was taken to the medical department where he received pain medication, stitches, and an x-ray. *Id.*; (Dkt. 73-3 at 16, 20 (Medical Records)). Mr. Scott was then taken to an area hospital where he was assessed and discharged (Dkt. 73-3 at 2). Upon his return from the hospital, he was placed in yet another different housing unit (Dkt. 73-4 (Updated Location History); Dkt. 88-1 ¶ 6 (Unit Team Manager Shaver Decl.)).

### III.   DISCUSSION

Prison officials have a duty to protect inmates from violent assaults by other inmates. *Farmer v. Brennan*, 511 U.S. 825, 833 (1994). They incur liability for the breach of that duty when they were "'aware of a substantial risk of serious injury to [an inmate] but nevertheless failed to take appropriate steps to protect him from a known danger.'" *Guzman v. Sheahan*, 495 F.3d 852, 857 (7th Cir. 2007) (quoting *Butera v. Cottey*, 285 F.3d 601, 605 (7th Cir. 2002)); *see also Santiago v. Walls*, 599 F.3d 749, 758–59 (7th Cir. 2010). To succeed on a claim for failure to protect, Mr. Scott must show that (1) Defendants were aware of a substantial risk of serious injury to him, and (2) they acted with deliberate indifference to that risk. *See Farmer*, 511 U.S. at 834, 837; *Dale v.*

8

*Poston*, 548 F.3d 563, 569 (7th Cir. 2008). An official will only be liable when he disregards that risk by failing to take reasonable measures to abate it. *Borello v. Allison*, 446 F.3d 742, 747 (7th Cir. 2006). Further, damages are unavailable for fear of an unrealized attack. *Babcock v. White*, 102 F.3d 267, 270 (7th Cir. 1996).

A. **Commissioner Reagle**

Commissioner Reagle is entitled to summary judgment because there is no evidence that she was personally involved in evaluating Mr. Scott's requests for protective custody or his housing placement at Pendleton.

"[I]ndividual liability under § 1983 . . . requires personal involvement in the alleged constitutional deprivation." *Colbert v. City of Chicago*, 851 F.3d 649, 657 (7th Cir. 2017) (internal quotation omitted) (alteration in original). "The plaintiff must demonstrate a causal connection between (1) the sued officials and (2) the alleged misconduct." *Id.* For a public official to be individually liable for a subordinate's constitutional violation, the official must both "(1) know about the conduct and (2) facilitate, approve, condone, or turn a blind eye toward it." *Gonzalez v. McHenry County*, 40 F.4th 824, 828 (7th Cir. 2022) (internal quotation omitted).

Commissioner Reagle attested that she was never aware of any attacks on Mr. Scott by other inmates at Pendleton and was not involved in his protective custody requests or his housing placement (Dkt. 123-6 ¶ 9). Mr. Scott has pointed to no admissible evidence to the contrary. Accordingly, Commissioner Reagle is entitled to summary judgment.

B. **Warden Reagle**

There is sufficient evidence in the record for a reasonable jury to conclude that Mr. Scott has met the objective prong of a failure-to-protect claim. That is, there is evidence that Mr. Scott

had conflicts with other inmates that exposed him to a risk of serious physical harm. *See Farmer*, 511 U.S. at 834.

Warden Reagle can be liable for this risk only if there is evidence that he was subjectively aware of that risk and acted with deliberate indifference by failing to take reasonable steps to protect Mr. Scott. *Id.* at 837, 844 ("[P]rison officials who actually knew of a substantial risk to inmate health or safety may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted."); *Borello*, 446 F.3d at 747; *Babcock*, 102 F.3d at 270.

As to the February 16, 2023 protective custody request, there is no evidence that Warden Reagle was involved in assessing the request or denying it. Warden Reagle attested that he was only notified of a protective custody request if it involved a complex situation or a facility transfer (Dkt. 123-2 ¶ 5). The Pendleton official who denied the request denied it because Mr. Scott failed to provide any specific factual allegations in the request form about the threat of harm, and he therefore did not meet the criteria for being placed in protective custody (Dkt. 46-1; Dkt. 46-2). Because there is no evidence that Warden Reagle was apprised of this particular request, no reasonable jury could conclude he was deliberately indifferent when it was denied.

Warden Reagle was aware that Mr. Scott had submitted a request for protective custody on February 21, 2023 (Dkt. 123-3; Dkt. 123-2 ¶ 7). There, Sergeant Miller informed a group of Pendleton staff by email that Mr. Scott had expressed concerns that another inmate in his housing unit would assault him (Dkt. 123-3 at 3). Another IDOC staff member responded, raising concerns about Mr. Scott's truthfulness and noting that he had failed to provide specific information about the harm when he filled out his protective custody request form. *Id.* at 2–3. That staff member noted that Mr. Scott could resubmit the form if he could provide specific information about who was threatening him. *Id.* At that point, Warden Reagle recommended that Mr. Scott be returned to

10

his housing unit so that he could discuss the threats with case management staff and submit a new request for protective custody. *Id.* at 2. Warden Reagle sent a follow-up email in which he wrote "[m]ake sure the unit know[s] that he may need to be seen though or may act out to get thrown in" a different housing unit. *Id.* at 1.

Although this communication may be seen as dismissive, no reasonable juror could infer that this response shows deliberate indifference. Warden Reagle did not decide whether Mr. Scott should or should not be in protective custody. Rather, he advised his staff to confer with Mr. Scott about the threats he had received and submit another protective custody request form if warranted. This was a reasonable response given the staff's concerns that Mr. Scott had ulterior motives for seeking protective custody and had failed to provide the requisite information to qualify for protective custody. Importantly, there is no evidence that Mr. Scott was ever violently attacked as a result of the denial of this particular request.

Next, there is no evidence that Warden Reagle was involved in the July 2023 request for protective custody. Similar to the February 16, 2023 request, the July 2023 request seems to have been wholly resolved by Warden Reagle's staff (Dkt. 46-4); *see Horshaw v. Casper*, 910 F.3d 1027, 1029 (7th Cir. 2018) ("Liability under § 1983 is direct rather than vicarious; supervisors are responsible for their own acts but not for those of subordinates, or for failing to ensure that subordinates carry out their tasks correctly."). The only evidence that Warden Reagle knew of an issue involving Mr. Scott around this time was a July 2023 email about a confiscation of an inmate's weapon that Mr. Scott had reported (Dkt. 123-5). The contents of this email reflect that the weapon was confiscated without anyone being harmed. *Id.* Further, the undisputed evidence shows that Mr. Scott was moved to a different housing unit due to his July 2023 protective custody

11

request (Dkt. 46-4). Accordingly, the only reasonable inference is that staff at Pendleton responded reasonably to Mr. Scott's request, despite the lack of verifiable evidence of a threat.

The only incident resulting in serious injury to Mr. Scott occurred in April 2024, two months after Warden Reagle departed Pendleton. No reasonable jury could conclude that he was involved in any of the actions that resulted in this unfortunate incident. *Colbert*, 851 F.3d at 657.

In summary, Warden Reagle cannot be found liable because he was not involved in the February 16 or July 23, 2023 requests for protective custody. His response to the February 21, 2023 email chain reflects that he took the threats to Mr. Scott's safety seriously but recommended that Mr. Scott take additional steps to fill out a protective custody form that complied with IDOC policy. Warden Reagle was also not employed at Pendleton when Mr. Scott was stabbed. For these reasons, Warden Reagle is entitled to summary judgment.

### IV. MOTION FOR CASE STATUS AND MOTION FOR COURT ASSISTANCE

On August 8, 2025, Mr. Scott filed a letter with this case number at the top, which has been docketed as a Motion for Case Status but is, in substance, a motion for forms (Dkt. 154). Mr. Scott requests two complaint forms so that he can file lawsuits against doctors in Allen County. *Id.* This motion is **granted** to the extent that **the Clerk is directed** to send Mr. Scott two "Complaint for Violation of Civil Rights" forms with his copy of this Order. That said, Mr. Scott is reminded that motions filed in a case must be related to *that* case. The Court also notes that Allen County, Indiana, is served by the District Court for the Northern District of Indiana, not the Southern District. Many forms are available on the Northern District of Indiana's website. *See* United States

District Court, Northern District of Indiana, "Representing Yourself," https://www.innd.uscourts.gov/representing-yourself.[4]

On August 18, 2025, Mr. Scott filed a Motion for Court Assistance, in which he requests a copy of the video of the April 2024 stabbing because staff at New Castle Correctional Facility refused to provide him a copy of the video upon his release from IDOC (Dkt. 155). Mr. Scott also discusses a dental implant that he alleges was placed in his tooth by law enforcement to track him. This Motion is **denied** because the briefing for the motion for summary judgment is closed, and this Order resolves that motion. To the extent that Mr. Scott needs the video for another purpose, he should request a copy from Defendants. Mr. Scott's concerns regarding a dental implant appear to be unrelated to this action. Mr. Scott refers to a second lawsuit concerning the dental implant, so any request for assistance should be made in that case.

## V.  CONCLUSION

For the reasons explained in this Order, Defendants' Motion for Summary Judgment, Dkt. [122], is **GRANTED**. Mr. Scott's motion for court forms, Dkt. [154], is **GRANTED** to the extent that **the Clerk is directed** to send Mr. Scott two complaint forms with his copy of this Order. Mr. Scott's motion for court assistance, Dkt. [155], is **DENIED**.

Final judgment will issue in a separate entry.

**IT IS SO ORDERED.**

Date: 9/29/2025

Hon. Tanya Walton Pratt, Judge
United States District Court
Southern District of Indiana

---

[4] This District Court's forms are likewise available on this Court's website, or by making a request to the clerk of court for this District. *See* United States District Court, Southern District of Indiana, "Representing Yourself in United States District Court," https://www.insd.uscourts.gov/representing-yourself-united-states-district-court.

Distribution:

EDDRELL SCOTT
7117 Venture Lane
Ft. Wayne, IN 46818

All Electronically Registered Counsel